UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD J. BECK,

        Plaintiff,

                                      Case No. 17-cv-10267

v.

                                      HON. MARK A. GOLDSMITH

FCA US LLC,

        Defendant.

_____/

**OPINION & ORDER**
**GRANTING DEFENDANT'S MOTION TO DISMISS (Dkt. 24)**

In this putative class action, Plaintiff Donald J. Beck, a California resident, alleges that several of Defendant FCA US LLC's vehicles have a defective gearshift system, which inaccurately indicates that the vehicles are in the Park gear when, in fact, they are not. This has supposedly led to a number of rollaway incidents. FCA has filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Dkt. 24). The motion has been fully briefed, and a hearing was held on June 7, 2017. For the reasons stated below, the Court grants FCA's motion.[1]

## I. BACKGROUND

Beck brings this action on behalf of himself and all similarly situated persons who purchased or leased a model year 2013 through 2016 Dodge Ram 1500 or a model year 2014

---

[1] Beck has also filed two motions for leave to file a notice of supplemental authority (Dkt. 30, 33), regarding recent decisions in In re FCA US LLC Monostable Electronic Gearshift Litigation, No. 16-md-026744, 2017 WL 1382297 (E.D. Mich. Apr. 18, 2017) (involving an allegedly defective gearshift system), and In re Volkswagen Timing Chain Product Liability Litigation, No. 16-2765, 2017 WL 1902160 (D.N.J. May 8, 2017) (involving an allegedly defective timing chain system). Beck claims that these decisions support his opposition to FCA's motion to dismiss. Upon review, the Court finds that neither of those decisions alters the analysis or conclusions reached in this opinion. Those motions are denied.

through 2016 Dodge Durango (the "class vehicles"), all of which were designed, manufactured, and distributed by FCA. Compl. ¶¶ 1, 3, 21, 22 (Dkt. 1).

These class vehicles are equipped with a "shift-by-wire" transmission system, which does not use a mechanical linkage between the gear-shifting lever and the transmission. Id. ¶ 23; see also id. ¶ 4 ("[C]onventional . . . gear shifters are . . . tied to a cable that allows drivers to physically change gears when they so choose."). Rather, these systems use electronic signals and electronic modules to manipulate transmission gear changes. Id. ¶ 24. When the driver engages the control mechanism, electronic signals are sent to the electronic control module, which then shifts the transmission into the desired gear. Id. This type of transmission system helps save materials and manufacturing costs, as well as design space in the center console area. Id. ¶ 23.

Unlike an electronic "monostable shifter" (where the shifter lever is supposed to return to a single predetermined location after the desired gear is selected) or the more traditional feeling of a "polystable shifter" (where the shifter slides back and forth and rests in predetermined physical slots for the gears), the class vehicles are equipped with a "rotary shifter." Id. ¶¶ 25, 28, 30-31.[2] As the name implies, this system uses a rotary dial to cycle through the gears, sending an electronic signal that corresponds with the selected gear. Id. ¶¶ 5, 31. Once the driver has selected his or her desired gear, the corresponding letter above the rotary dial (either "P" for Park, "R" for Reverse, "N" for Neutral, or "D" for Drive) illuminates. Id. ¶ 32. The selected gear letter also appears on the "driver's informational display" on the vehicle's dashboard. Id. For illustrative purposes, the rotary shifters in the class vehicles look something like this:

---

[2] There is currently a multidistrict litigation action pending in this district before Judge David Lawson concerning purported defects in the monostable shifter system in certain FCA vehicles. See In re FCA US LLC Monostable Electronic Gearshift Litig., No. 16-md-02744 (E.D. Mich.).



<u>Id.</u> ¶ 33 (image of 2014 Dodge Durango rotary shifter).[3]

Beck alleges that the rotary shifter system in the class vehicles is defective for two reasons: (i) it "wrongly indicates [via the illuminated informational displays] that cars are in Park when they are not," and (ii) it "fails to include a safety override that would automatically put the vehicle in Park or engage a parking brake when a driver attempts to exit the vehicle when it is not in Park." <u>Id.</u> ¶ 5; <u>see also</u> <u>id.</u> ¶ 3 (FCA "designed and manufactured cars with rotary shifter systems that wrongly indicate cars are in Park when they are not and, also, fail to include any safety-override feature for preventing rollaway accidents caused by such misinformation.").[4] According to Beck, these defects have "resulted in numerous accidents and vehicle rollaways as

---

[3] Beck refers to the rotary shifter system in the class vehicles as the "Defective Shifter System." Compl. ¶ 5.

[4] Beck notes that other car manufacturers, such as BMW, have included a safety-override feature for vehicles equipped with "non-traditional shifter systems," which operate as follows: "if a car is not in 'Park,' the driver's door is opened, and the foot brake is released, the car automatically shifts into 'Park.'" <u>Id.</u> ¶ 10.

a result of drivers not knowing which gear their transmission is in and/or exiting their vehicle without the vehicle in Park." Id. ¶ 5.[5]

Beck points out that the National Highway Transportation Safety Administration's Office of Defects Investigation ("NHTSA-ODI") opened a preliminary evaluation on December 16, 2016, after having "identified 43 complaints alleging vehicle rollaway from a parked position in [the class vehicles]." ODI Resume, Ex. B to Compl. (Dkt. 1-3). According to the NHTSA-ODI, these reports "alleged that the unintended motion occurred after the driver moved the transmission gear selector to Park and exited the vehicle," and that 34 of the reports "alleged that the vehicle was moving while the shifter indicated that it was in the park position." Id. The NHTSA-ODI estimated the population of class vehicles at 1,000,000. Id. Beck has copied 15 of the consumer complaints into his complaint, which range in date from December 5, 2013 to November 15, 2016. See Compl. ¶ 55.

Beck experienced a rollaway incident himself. On June 22, 2015, he purchased a new 2015 Dodge Ram 1500 for personal use from a dealership in Carlsbad, California. Id. ¶ 18. At some point in time following the purchase, Beck alleges that, after he "pulled into his driveway and put the vehicle in 'Park,' . . . [t]he vehicle started rolling backwards down the driveway

---

[5] Other portions of the complaint suggest that there is only one defect in the system itself — the rotary shifter system's indication that the vehicle is in Park when it is not — and that the safety-override feature is merely something that should be included anytime a vehicle is equipped with a rotary shifter to make it safer. See, e.g., Compl. ¶ 2 ("[I]f a car maker decides to use electronically controlled 'rotary' shifters — rather than traditional mechanical sliding shifters — it should include a safety override that automatically puts the car in Park or engages the parking brake when the driver gets out of the car."); id. ¶ 36 ("FCA has failed to inform Plaintiff and members of the Classes of the Defective Shifter System which contains an unreasonably dangerous defect, and failed to implement any safety-override that would cause the Class Vehicles to automatically shift into Park or engage the parking brake when the driver-side door is open and the driver is exiting the vehicle.").

before [he] could turn off the engine." Id. ¶ 19. As of the time the complaint was filed, Beck still owns the vehicle. Id. ¶ 18.

Beck alleges that FCA knew, or should have known, of the defective rotary shifter system and the associated safety risks through "pre-production testing, pre-production design failure mode effects analysis, production design failure mode effects analysis, early consumer complaints made to FCA's network of exclusive dealers and NHTSA, basic design guidelines, and Federal Motor Vehicle Safety Standards." Id. ¶ 50. Despite this knowledge, FCA failed to notify consumers of the defect or provide a remedy to protect consumers from the associated safety risks. Id. ¶¶ 9, 52, 59.

Beck further alleges that FCA "knowingly made misrepresentations and omissions about the quality, reliability, safety, characteristics and performance" of the class vehicles. Id. ¶ 74; see also id. ¶ 13 (misrepresenting the "standard, quality, or grade" of the class vehicles, and "knowingly . . . omitted and/or concealed the existence of [the defect] to increase profits by selling additional" class vehicles). These purported misrepresentations appeared in numerous FCA advertising on its website. See generally id. ¶¶ 42-48.

Notably, Beck is not seeking damages for any sort of personal injury. See id. at 73-74 (request for relief). Nor is he seeking to represent any class members for claims of personal injury. See id. ¶ 77 ("Excluded from the Class are individuals who have personal injury claims resulting from the defectively designed Defective Shifter System in their Class Vehicles."). Instead, Beck is seeking only economic damages related to the allegedly defective rotary shifter system.

Beck claims that he and the class members were harmed by the defective rotary shifter system in two particular ways. First, "they did not receive the benefit of the bargain of the

purchase or lease" of the class vehicles, which were "sold and leased as safe and reliable vehicles at premium prices." Id. ¶ 12; see also id. ¶ 3 ("[A]ll purchasers and lessees of [the class] vehicles paid more than the vehicle was actually worth" due to the "concealed and dangerous gearshift system defect that places drivers and occupants of the vehicles, as well as the public, at risk for serious injury or death."). Second, as a result of the NHTSA's announcement of its investigation, the class members each "own a vehicle that is diminishing in value at an increased rate each month and thus cannot be sold without incurring substantial losses." Id. ¶ 12; see also ¶ 15 ("Plaintiff and members of the Classes have been harmed and are entitled to . . . damages for the benefit of the bargain they struck when purchasing their vehicles, [and] the diminished value of their vehicles. . . ."). Beck claims that, had he and the class members known of the defect, they would have either (i) paid substantially less for the vehicles, (ii) required an immediate remedy that restored the vehicles to the conditions bargained for, or (iii) not purchased or leased the class vehicles. Id. ¶ 63.

On January 26, 2017, Beck filed the instant class-action complaint, asserting five claims: (i) violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 et seq.; (ii) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq.; (iii) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal Civ. Code § 1750 et seq.; (iv) fraudulent concealment under California law; (v) breach of implied warranty of merchantability under California Commercial Code § 2314 (which is modeled on the Uniform Commercial Code); (vi) breach of express warranty under California Commercial Code § 2313; and (vii) violation of the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790 et seq.

## II.  STANDARDS OF DECISION

A motion that alleges lack of standing is properly characterized as a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1). See Stalley v. Methodist Healthcare, 517 F.3d 911, 916 (6th Cir. 2008) ("We review de novo a district court's dismissal of a case for lack of standing — lack of subject matter jurisdiction — under Fed. R. Civ. P. 12(b)(1)."). In considering whether to dismiss a complaint under Rule 12(b)(1) due to lack of subject-matter jurisdiction, the plaintiff bears the burden of proving the existence of subject-matter jurisdiction. Musson Theatrical, Inc. v. Fed. Express Corp., 89 F.3d 1244, 1248 (6th Cir. 1996); Moir v. Greater Cleveland Reg'l Transit Auth., 895 F.2d 266, 269 (6th Cir. 1990). Challenges to subject-matter jurisdiction fall into two general categories: "facial attacks" — which argue that the pleading allegations are insufficient — and "factual attacks" — which challenge the factual veracity of the allegations. United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994). On a motion raising a facial attack, "the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." Id. In reviewing a motion raising a factual attack, "the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Id.

On a motion to dismiss pursuant to Rule 12(b)(6), "[t]he defendant has the burden of showing that the plaintiff has failed to state a claim for relief." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007) (citing Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991)), cert. denied, 552 U.S. 1311 (2008). To survive a Rule 12(b)(6) motion, the plaintiff must allege sufficient facts to state a claim to relief above the speculative level, such that it is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The plausibility standard requires courts to accept the alleged facts as true, even when their truth is doubtful, and to make

all reasonable inferences in favor of the plaintiff.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Twombly, 550 U.S. at 555-556.

Evaluating a complaint's plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. Although a complaint that offers no more than "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" will not suffice, id. at 678, it need not contain "detailed factual allegations," Twombly, 550 U.S. at 555; see also Erickson v. Pardus, 551 U.S. 89, 93 (2007) ("[S]pecific facts are not necessary . . . .").  Rather, a complaint needs only enough facts to suggest that discovery may reveal evidence of illegality, even if the likelihood of finding such evidence is remote. Twombly, 550 U.S. at 556.  Thus, a motion to dismiss "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Directv, 487 F.3d at 476.

## III.  DISCUSSION

In its motion to dismiss, FCA first argues that, under Federal Rule of Civil Procedure 12(b)(1), this Court lacks subject-matter jurisdiction regarding Beck's second theory of defect predicated on the lack of a safety-override feature because Beck lacks standing.  FCA then argues that, under Rule 12(b)(6), the remainder of Beck's complaint should be dismissed because Beck has failed to state a claim upon which relief may be granted.[6]

### A.  Article III Standing for Defect Theory Based on Safety-Override Feature

---

[6] FCA also argues that Beck's injunctive relief claims should be dismissed with prejudice because they are preempted by the National Traffic and Motor Vehicle Safety Act of 1966, 49 U.S.C. § 30101 et seq.  Because FCA's motion is granted on other grounds, the Court will not address this additional argument.

The requirement for standing is derived from Article III of the U.S. Constitution, which limits the jurisdiction of federal courts to justiciable cases and controversies. Hollingsworth v. Perry, 133 S. Ct. 2652, 2661 (2013) (citing U.S. Const. art. III, § 2); Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37 (1976) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."). An essential feature of this requirement "is that any person invoking the power of a federal court must demonstrate standing to do so." Hollingsworth, 133 S. Ct. at 2661; see also DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 (2006) ("The core component of the requirement that a litigant have standing to invoke the authority of a federal court is an essential and unchanging part of the case-or-controversy requirement of Article III."). The doctrine of standing ensures that a federal court's exercise of power is not "gratuitous" or "inconsistent" with the limitations imposed by Article III. See Simon, 426 U.S. at 38; Clinton v. City of New York, 524 U.S. 417, 429-430 (1998) (stating that standing "serves to identify those disputes which are appropriately resolved through the judicial process"). As the party invoking federal jurisdiction, Beck bears the burden of establishing standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

A plaintiff must satisfy three requirements to establish Article III standing: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). As this case is at the pleading stage, Beck "must clearly allege facts demonstrating each element." Id.

Insofar as Beck claims that his vehicle is defective for lacking a safety feature that automatically shifts the vehicle into Park on its own, FCA argues that Beck lacks Article III

standing because he did not plead sufficient facts to show that he suffered an injury in fact.  <u>See</u> <u>generally</u> Def. Mot. at 6-8.  Notably, FCA does not challenge Beck's standing to pursue his other theory of defect — that the rotary shifter system in the class vehicles is defective because it wrongly indicates that the vehicles are in Park when they are not.  <u>See</u> Def. Reply at 1 (Dkt. 29).

An injury in fact is defined as "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." <u>Spokeo</u>, 136 S. Ct. at 1548.  The particularization component is necessary to establish an injury in fact and requires that the plaintiff be affected "in a personal and individual way." <u>Id.</u> (collecting cases).  The injury must also be concrete, i.e. "de facto," meaning that it actually exists. <u>Id.</u>

According to FCA, Beck only alleges two types of injuries in the form of economic harm: (i) he overpaid for his vehicle, and (ii) his vehicle has decreased in value.  Def. Mot. at 6 (citing Compl. ¶¶ 63, 66, 68).  However, because Beck does not allege that he either bargained or paid for an auto-park feature at the time of purchase, FCA contends that Beck could not have overpaid for a vehicle lacking such a safety feature. <u>Id.</u> at 7-8.  Nor could any diminished value in Beck's vehicle be tied to the lack of the feature. <u>Id.</u>

Beck does not appear to directly confront any of the specific arguments that were raised in FCA's motion.  He does not contend that the auto-park safety feature was part of the bargain when he purchased his vehicle.  Nor does he suggest that he has sustained any sort of concrete and particularized injury as a result of his vehicle lacking this specific feature.  Rather, Beck responds in a way that suggests he is abandoning any theory based on the absence of this feature: "[T]his case is not about a belated requested for an 'Auto-Park' feature; this case is about FCA's manufacture and sale of automobiles that do not reliably perform a basic function — engaging and staying in Park when placed in that gear."  Pl. Resp. at 6 (Dkt. 28).  He further states that

"[b]ut for the defect, an 'Auto-Park' feature would not be necessary." Id. The remainder of his responsive argument on this point focuses on the alleged defective rotary shifter system and the consequent economic harm he and the putative class members have suffered. See id. at 6-7.

To the extent Beck is claiming that he suffered economic harm because his vehicle was defective for not including an auto-park safety feature — a feature that was neither expected nor part of the bargain — the Court agrees with FCA that Beck has failed to sufficiently allege an injury in fact for such a purported theory. See Birdsong v. Apple, Inc., 590 F.3d 955, 961 (9th Cir. 2009) ("The plaintiffs' benefit of the bargain theory fares no better. They have not alleged that they were deprived of an agreed-upon benefit in purchasing their iPods. . . . The plaintiffs' alleged injury in fact is premised on the loss of a 'safety' benefit that was not part of the bargain to begin with."); Lassen v. Nissan N.A., Inc., 211 F. Supp. 3d 1267, 1283-1284 (C.D. Cal. 2016) ("Insofar as Plaintiffs' claimed economic damages arising out of the alleged 'defect' can be characterized as 'benefit of the bargain' damages, they fail to establish standing because that alleged injury in fact is premised on the loss of a 'safety' benefit that was not part of the bargain to begin with. . . . In summary, Plaintiffs did not purchase their vehicles based on any expectation that they included additional safety features."); Azoulai v. BMW of N.A. LLC, No. 16-cv-00589, 2017 WL 1354781, at *6 (N.D. Cal. Apr. 13, 2017) ("Plaintiffs here claim that there is a defect because the product for which they paid $500 to $1000 lacks a feature — a sensor — that they believe would make the vehicles safer. However, Plaintiffs do not allege that this feature was bargained for.").[7]

---

[7] Judge Lawson's decision in In re FCA US LLC Monostable Electronic Gearshift Litigation, No. 16-md-026744, 2017 WL 1382297 (E.D. Mich. Apr. 18, 2017), does not alter this Court's conclusion. The plaintiffs in that case brought similar allegations against FCA concerning a defective monostable shifter system — generally, they alleged that "the vehicles are defective because they do not shift into 'Park' properly, and rollaway incidents can and have resulted as a

Because Beck lacks standing to pursue the distinct theory that the class vehicles were defective for lacking a safety-override feature, the Court lacks subject matter jurisdiction over that particular theory.  This portion of FCA's motion is granted.

## B.  Affirmative Fraudulent Misrepresentation Claims

Beck asserts affirmative misrepresentation claims under both the UCL and the CLRA.  FCA raises several arguments for dismissal of these claims, which the Court addresses in turn.

### 1.  Pre-Suit Notice for CLRA

Under the CLRA — which prohibits certain "unfair methods of competition and unfair or deceptive acts or practices" regarding the sale of goods to consumers — a potential plaintiff must provide notice to the offending party by certified or registered mail thirty days or more before commencing an action for damages.  Cal. Civ. Code §§ 1770(a), 1782(a).  The purpose of the notice is to "allow a defendant to avoid liability for damages if the defendant corrects the alleged wrongs within 30 days after notice, or indicates within that 30-day period that it will correct those wrongs within a reasonable time."  In re Fluidmaster, Inc., 149 F. Supp. 3d 940, 949 (N.D. Ill. 2016) (quoting Morgan v. AT&T Wireless Servs., 99 Cal. Rptr. 3d 768, 789 (Cal. Ct. App. 2009)).

FCA argues that Beck's CLRA claim should be dismissed because Beck failed to provide the requisite pre-suit notice thirty days before filing suit.  Def. Mot. at 15.  Although Beck acknowledges that he did not provide notice before initiating the present action, he now claims

consequence."  Id. at *1.  FCA characterized the claim as only alleging the absence of an "auto park" feature, but Judge Lawson held that the plaintiffs were claiming "it is the lack of a physical indication of the gear selected, together with the absence of an 'auto park' feature, that has caused numerous incidents in which a driver got out of his or her car, thinking it was safely in 'Park' when it was not . . . ."  Id. at *2 (emphasis in original).  Because Beck is not making that kind of integrated allegation, Judge Lawson's case is not analogous.  Further, his opinion has no application here, as it did not address standing for a plaintiff alleging loss-of-the-benefit-of-the-bargain when he did not bargain for a missing safety feature.

that a formal notice has since been provided to FCA, which is sufficient to satisfy the notice requirement. <u>See</u> Pl. Resp. at 24-25 (citing <u>Morgan</u>, 99 Cal. Rptr. 3d at 790).

The Court finds that Beck's attempt to provide a notice <u>after</u> filing suit is insufficient to satisfy the CLRA notice requirement. <u>See</u> <u>In re Fluidmaster, Inc.</u>, 149 F. Supp. 3d at 950 (dismissing the plaintiffs' CLRA claim because the formal notice was provided to the defendant after filing suit).

Beck's reliance on <u>Morgan</u> does not alter that conclusion. In <u>Morgan</u>, the plaintiffs brought a claim for damages under the CLRA for the first time in their second amended complaint. <u>Morgan</u>, 99 Cal. Rptr. 3d at 789. After the trial court found that the plaintiff did not properly comply with the notice requirement, the plaintiffs filed a third amended complaint, in which they alleged that they sent the required notice four months before filing the third amended complaint. <u>Id.</u> Based on those circumstances, the court of appeals concluded that the plaintiffs satisfied the thirty-day notice requirement. <u>Id.</u> at 790.

<u>Morgan</u> is easily distinguishable from the present matter. Although the plaintiffs in that case provided notice to the defendant <u>after</u> the <u>original complaint</u> was filed, that notice was provided more than thirty days <u>before</u> the <u>third amended complaint</u> was filed, which became the operative complaint in that case. Unlike the plaintiffs in <u>Morgan</u>, Beck has only filed one complaint, which still remains operative. Thus, his notice to FCA continues to be post-filing of the complaint.

This portion of FCA's motion is granted, and Beck's CLRA claim is dismissed.

### 2. Non-Actionable Puffery

Having dismissed the CLRA claim, the Court is left with Beck's affirmative misrepresentation claim under the UCL. To bring a claim for a violation of § 17200 of the UCL,

"a plaintiff must show either an (1) 'unlawful, unfair, or fraudulent business act or practice,' or (2) 'unfair, deceptive, untrue or misleading advertising.'" Lippitt v. Raymond James Fin. Servs., Inc., 340 F.3d 1033, 1043 (9th Cir. 2003) (quoting Cal. Bus. & Prof. Code § 17200). Thus, to state a claim under § 17200, a plaintiff must establish that the practice is either "(1) unlawful (i.e., is forbidden by law), (2) unfair (i.e., harm to victim outweighs any benefit) or (3) fraudulent (i.e., is likely to deceive members of the public)." Moss v. Infinity Ins. Co., 197 F. Supp. 3d 1191, 1198 (N.D. Cal. 2016). "A plaintiff only needs to establish a violation of the UCL under one of these three prongs, as each operates independently from the others." Id. (citing State Farm Fire & Cas. Co. v. Superior Court, 53 Cal. Rptr. 2d 229, 233-234 (Cal. Ct. App. 1996)); see also Lozano v. AT & T Wireless Servs., Inc., 504 F.3d 718, 731 (9th Cir. 2007) (each prong of the UCL is a "separate and distinct theory of liability").[8]

UCL claims are governed by the "reasonable consumer" test, which requires Beck to "show that members of the public are likely to be deceived." Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008). A "reasonable consumer" is considered an "ordinary consumer acting reasonably under the circumstances, and is not versed in the art of inspecting and judging a product, in the process of its preparation or manufacture." Colgan v. Leatherman Tool Grp., Inc., 38 Cal. Rptr. 3d 36 (Cal. Ct. App. 2006).

To be actionable, the defendant's "statement must make a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." Vitt v. Apple Computer, Inc., 469 F. App'x 605, 607 (9th Cir. 2012). Assertions that are

---

[8] The Court puts aside the fact that, because Beck does not clearly allege which prong his UCL claim falls under, the claim should be dismissed in its entirety. See Moss, 197 F. Supp. 3d at 1199 (dismissing UCL claim, with leave to amend, because the plaintiff did not clearly allege which prong of the UCL her claim was proceeding under). Nevertheless, viewing the allegations as pleaded, it appears as though Beck is most likely pursuing a claim only under the UCL's fraudulent-practice prong.

subjective, generalized, vague, and unspecified amount to "mere puffery," which is not actionable because a reasonable consumer could not rely on it. In re Seagate Tech. LLC Litig., 233 F. Supp. 3d 776, 2017 WL 528398, at *12 (N.D. Cal. 2017) (citing Anunziato v. eMachines, Inc., 402 F. Supp. 2d 1133, 1139 (C.D. Cal. 2005)); see also Welk v. Beam Suntory Import Co., 124 F. Supp. 3d 1039, 1043 (S.D. Cal. 2015) ("Although misdescriptions of specific or absolute characteristics of a product are actionable, generalized, vague, and unspecified assertions constitute mere puffery upon which a reasonable consumer could not rely."); In re Clorox Consumer Litig., 894 F. Supp. 2d 1224, 1233 (N.D. Cal. 2012) ("The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions."). Examples of terms that consistently qualify as puffery include "quality," "reliability," "performance," and "safely." See, e.g., In re Seagate, 2017 WL 528398, at *12; Azoulai, 2017 WL 1354781, at *8; see also Vitt, 469 F. App'x at 607 (affirming 12(b)(6) dismissal based on "inherently vague and generalized terms" like "mobile," "durable," "portable," "rugged," "built to withstand reasonable shock," "reliable," "high performance," "high value," an "affordable choice," and an "ideal student laptop," because they are non-actionable puffery and "not factual representations that a given standard has been met").

In the complaint, Beck claims that he purchased his particular vehicle "because of its reputation for safety and utility consistent with his review of FCA's advertising messaging regarding safety and reliability." Compl. ¶ 18; see also id. ¶ 66 ("Plaintiff and Class members paid premiums to purchase the Class Vehicles as a result of the brand, reliability, value, and safety representations made by FCA."). According to Beck, FCA represents on its website that its "objective is to ensure vehicle quality and safety," and that its "vehicles meet the highest standard in terms of safety, ecological profile, driving performance and quality." Id. ¶ 43.

FCA's website further provides that "[t]o ensure that FCA vehicles deliver maximum safety and quality to customers over their entire life, every mechanical and electronic component, body part and trim element is rigorously tested. The designers work with a team of researchers during the testing phase to ensure vehicles meet the highest standards in terms of safety, ecological profile, driving performance and quality." Id.

For the Ram 1500 in particular, FCA's website stated that "[d]ecades of rigorous safety, security and quality testing go into every model before the rubber hits the road." Id. ¶ 47; see also id. ("Strength like this doesn't develop overnight . . . . Our Ram trucks have evolved from decades of rigorous testing and safety and security improvements to deliver one of our most advanced trucks on the road."). FCA also asserts that the Ram 1500 "is equipped with some of the most advanced safety and security technology available . . . ." Id.[9]

In its motion to dismiss, FCA argues that all of the purported misrepresentations relate to the vehicles being "safe" and "reliable," which merely amounts to non-actionable puffery. Def. Mot. at 15. While Beck acknowledges that generalized statements about quality and reliability may be puffery, he contends that FCA's representations about "rigorous testing" and trucks being "equipped with some of the most advanced safety and security technology available" are actionable because they could be disproved through discovery. Id. at 12-13 (citing Anunziato, 402 F. Supp. 2d at 1140-1141).

The Court concludes that, to the extent Beck is claiming that he relied on any FCA's representations regarding their vehicles' general safety, quality, reliability, or performance, those assertions undoubtedly constitute non-actionable puffery. See Vitt, 469 F. App'x at 607; In re Seagate, 2017 WL 528398, at *12; Anunziato, 402 F. Supp. 2d at 1140-1141; Azoulai, 2017 WL

[9] Notably, Beck never alleges which, if any, of these particular representations on FCA's website he personally viewed or relied on when he purchased his Ram 1500 in 2015.

1354781, at *8. The Court also concludes that FCA's representation that the Ram 1500 was "equipped with some of the most advanced safety and security technology available" to be non-actionable puffery. See Anunziato, 402 F. Supp. 2d at 1140 (finding that the defendant's representation that "[e]ach and every eMachines notebook uses the latest technology" to be non-actionable puffery).

There is also nothing specific or measurable about the phrase "rigorous testing." This phrase is highly subjective and vague. See Solum v. Certainteed Corp., 147 F. Supp. 3d 404, 412-413 (E.D.N.C. 2015) (holding that statements that "a credential is 'prestigious' or that a course is 'rigorous'" were "too vague and general to amount to anything more than mere puffery," because they expressed "nothing more than a general opinion, and thus cannot reasonably be relied upon"); see also In re Seagate, 2017 WL 528398, at *12 (finding that the defendant's representation that an internal hard drive was "produced using the most sophisticated manufacturing process in the industry" to be non-actionable puffery).

Because Beck fails to state a claim under the UCL for any affirmative misrepresentation, this portion of FCA's motion is granted; this portion of the UCL claim is dismissed.

### C. Fraudulent Omission and Concealment Claims

In addition to affirmative misrepresentation claims, Beck also asserts a fraud-by-omission claim under the UCL regarding FCA's alleged failure to disclose the defective rotary shifter system in the class vehicles, as well as a fraudulent concealment claim under California law. Both of these claims substantially overlap. FCA raises several arguments for why these claims should be dismissed, which the Court addresses in turn.

### 1. Pleading with Particularity under Rule 9(b)

Under the liberal pleading standard of Federal Rule of Civil Procedure 8, a pleader is required to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); see also Fed. R. Civ. P. 8(d)(1) ("Each allegation must be simple, concise, and direct."). However, there is a heightened pleading standard under Rule 9(b) for claims that "sound in fraud," which requires that the circumstances be pleaded with particularity. Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2003); Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "While a federal court will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b) requirement that the circumstances of the fraud must be stated with particularity is a federally imposed rule." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103 (9th Cir.2003) (emphasis omitted). A plaintiff must generally allege the "who, what, where, when, and how" of the misconduct to satisfy Rule 9(b). Cafasso, United States ex. rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011).

FCA argues that Beck's omission claims, as pleaded, do not satisfy the heightened standard of Rule 9(b) because he did not allege (i) "when or where the omitted information should (or could) have been revealed"; (ii) "facts regarding the person(s) responsible for the failure to disclose"; (iii) "the context of the omissions," including the circumstances of the purchase, who he talked to, and where he looked for information; (iv) facts showing either "how any supposed omission misled Plaintiff," or what FCA "obtained as a result"; and (v) "when FCA supposedly knew of the defect or when Plaintiff was exposed to any fraud." Def. Mot. at 10-11 (emphasis omitted). The Court disagrees.

When it comes to claims of fraud by omission or fraudulent concealment, the plaintiff faces a slightly more relaxed pleading burden; the claim "can succeed without the same level of specificity required by a normal fraud claim." Baggett v. Hewlett-Packard Co., 582 F. Supp. 1261, 1267 (C.D. Cal. 2007). This is because a plaintiff alleging an omission-based fraud "will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim." Falk v. Gen. Motors Corp., 496 F. Supp. 2d 1088, 1098-1099 (N.D. Cal. 2007).

In MacDonald v. Ford Motor Company, 37 F. Supp. 3d 1087, 1096 (N.D. Cal. 2014), which involved claims that certain Ford vehicles contained defective coolant pumps, the court recognized the inherent limitations of an omission claim. The court then concluded that the plaintiff adequately alleged the "who what when and how" in that case: "the 'who' is Ford, the 'what' is its knowledge of a defect, the 'when' is prior to the sale of Class Vehicles, and the 'where' is the various channels of information through which Ford sold Class Vehicles." Id. Other courts have followed suit and applied the same pleading standard for alleged vehicle defects involving a manufacturer's failure to disclose. E.g., Bryde v. Gen. Motors, LLC, No. 16-cv-02421, 2016 WL 6804584, at *14 (N.D. Cal. Nov. 17, 2016) (involving an allegedly defective airbag system).

The analysis of MacDonald and Bryde applies with equal force to the facts of this case: Beck has adequately pleaded the "who" (FCA), the "what" (knowing about, yet failing to disclose, the alleged rotary shifter system defect), the "when" (from the time the vehicles were first placed on the market in 2012 to the present day), the "where" (the various channels through which FCA sold the class vehicles, including the dealership in Carlsbad, California, where Beck purchased his vehicle), and the "how" (if Beck and the class members had known of the alleged

defect, they would have not purchased or leased the class vehicles, or they would have paid less for them).  Thus, Beck has satisfied the pleading requirements for Rule 9(b).

## 2. Duty to Disclose

To state a fraud-by-omission claim under the UCL, a plaintiff must plead an omission that was "contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose."  Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1141 (9th Cir. 2012) (quoting Daugherty v. Am. Honda Motor Co., 51 Cal. Rptr. 3d 118, 126 (Cal. Ct. App. 2006)); see also Lassen, 211 F. Supp. 3d at 1287 (to establish consumer fraud claim, a plaintiff "must show that the manufacturers knew their vehicles were defective before selling them, and concealed or violated a duty to disclose the defect in order to induce [the plaintiff] to purchase those vehicles" (emphasis omitted)).  Under California law, the defendant's duty to disclose may arise in one of the following four situations: "(1) when the defendant is in a fiduciary relationship with the plaintiff, (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff, or (4) when the defendant makes partial representations but also suppresses some material fact."  Becerra v. Gen. Motors LLC, ___ F. Supp. 3d ___, 2017 WL 951028, at *6 (S.D. Cal. Mar. 10, 2017) (quoting In re Sony Gaming Networks, 996 F. Supp. 2d 942, 991 (S.D. Cal. 2014)).

Beck does not allege that FCA owed him a duty to disclose as a result of a fiduciary relationship.  Rather, he argues that "FCA had a duty to disclose because it had exclusive and superior knowledge of the defect, made partial disclosures, and concealed safety risks."  Pl. Resp. at 11.  FCA contends that Beck has failed to sufficiently allege facts that FCA had a duty to disclose under any of these three factors.

### i. Exclusive Knowledge

A defendant has a duty to disclose a defect based on exclusive knowledge when, "according to the complaint, defendant knew of this defect while plaintiffs did not, and, given the nature of the defect, it was difficult to discover."  Herron v. Best Buy Co., Inc., 924 F. Supp. 2d 1161, 1176 (E.D. Cal. 2013); see also Falk, 496 F. Supp. 2d at 1096 ("[A] duty to disclose exists when the defendant had exclusive knowledge of material facts not known to the plaintiff."). "[A] plaintiff alleging the existence of a duty to disclose must offer specific substantiating facts demonstrating that the defendant has exclusive knowledge about an alleged defect — not merely that the defendant has a superior understanding about the product's design generally."  Taragan v. Nissan N.A., Inc., No. C 09-3660, 2013 WL 3157918, at *6 (N.D. Cal. June 20, 2013).

According to FCA's motion, Beck has failed to plead facts that FCA had any knowledge of a "model-wide 'false park' defect."  Def. Mot. at 14.  FCA then argues the forty-three consumer complaints to NHTSA do not establish knowledge because there is no allegation that FCA was aware of those "statistically insignificant" complaints.  Id. (noting that, with an estimated 1,000,000 vehicles at issue, and only forty-three complaints posted, the rate of complaint since 2013 was .000043 percent).

In the complaint, Beck alleges that FCA "knew, or should have known," of the defect based on "pre-production testing, pre-production design failure mode effects analysis, production design failure mode effects analysis, early consumer complaint made to FCA's network of exclusive dealers and NHTSA," which were not provided to Beck or the class members.  Compl. ¶ 50; see also Pl. Resp. at 11-12 (arguing FCA had a duty to disclose because "FCA had exclusive and superior knowledge of the Defective Shifter System by virtue of consumer complaints, field data, pre-production testing, pre-production design failure mode analysis,

production design failure mode analysis of Class Vehicles and other FCA vehicles incorporating shift-by-wire technology"). Beck also alleged that FCA "regularly monitors NHTSA complaints in order to meet its reporting requirements under federal law and was provided knowledge of the defect in the Defective Shifter System through these complaints." Compl. ¶ 54.

Taking all of these allegations as true, the Court finds that Beck has failed to sufficiently allege that FCA had knowledge — let alone exclusive knowledge — of the defective rotary shifter system at the time of the sale. Regarding the generic allegations of FCA's access to "testing" and "analysis," courts have found substantially similar allegations to be insufficient to support an inference that a defendant knew about a design defect at the product's time of sale. See, e.g., Wilson, 668 F.3d at 1147 (finding allegation that the defendant knew of the defect because it had "access to aggregate information and data" as being "speculative" because plaintiff failed to "suggest how any tests or information could have alerted [the defendant] to the defect"); Grodzitsky v. Am. Honda Motor Corp., Inc., No. 2:12-cv-1142, 2013 WL 690822, at *6 (C.D. Cal. Feb. 19, 2013) (finding the plaintiffs' generalized assertion that unspecified "pre-release testing data" and "aggregate data from Honda dealers" failed to suggest how this information could have informed the defendant of the alleged defect at the time of sale); cf. In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig., 754 F. Supp. 2d 1145, 1192 (C.D. Cal. 2010) (finding that a complaint adequately alleged that defendants had exclusive knowledge of a defect upon alleging that it knew of "NHTSA's findings of a 400% increase in 'Vehicle Speed' complaints in [defendant's cars], 37,000 concealed consumer complaints, secret Field Technical Reports and Dealership Report, issues with the electronic throttle actuator assemblies shared only with dealers and later NHTSA,

eliminated references to [its cars'] speed control problems, concealed 'surging' complaints, and received consumer complaints post-recall, demonstrating the problem has not been fixed").

Nor is there a plausible inference of knowledge based on FCA's purported review of the forty-three NHTSA complaints, see Compl. ¶ 54, because Beck does not state how many of these complaints were filed before Beck purchased his Ram 1500 in June 2015, such that FCA knew about the purported defect at the time of sale. See Wilson, 668 F.3d at 1147 (finding that plaintiffs had not sufficiently alleged that the defendant knew of the alleged defect at the time of sale when plaintiffs' complaint alleged that the defendant had "access to the aggregate information and data regarding" the defect and identified fourteen consumer complaints, twelve of which were undated, and the two dated complaints made over two years after the plaintiffs purchased the product).

In fact, of the fifteen consumer complaints Beck copied into his complaint, only one pre-dates the sale of his vehicle, see Compl. ¶ 55, which further demonstrates that Beck has failed to adequately plead FCA's knowledge of an alleged defect at the time of sale, see Grodzitsky, 2013 WL 690822, at *7 (finding that customer complaints were insufficient to show that the defendant had knowledge of a defect at the time of sale where (i) "four of the ten online complaints identified by Plaintiffs were made after each lead Plaintiff bought his or her vehicle," (ii) "nine of the ten complaints were made after three of the five lead plaintiffs bought his or her vehicle," and (iii) "the listed complaints were all posted on a website that had no connection to Defendant" (emphasis in original)).[10]

---

[10] In his response, Beck also argues that FCA had a duty to disclose arising merely from the fact that the defect at issue in this case "is a safety hazard." Pl. Resp. at 12 (citing In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014); Falk, 496 F. Supp. 2d at 1096). The Court agrees with Beck to the extent he is claiming that a manufacturer has a duty to disclose when it knows of a defect in its product that poses a safety concern. See Wilson, 668

## ii. Active Concealment

To assert a duty to disclose arising from the defendant's active concealment, a plaintiff must allege the following:

> (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

Punian v. Gillette Co., No. 14-CV-05028, 2016 WL 1029607, at *10 (N.D. Cal. Mar. 15, 2016) (quoting Falk, 496 F. Supp. 2d at 1097).

Importantly, active concealment requires Beck to allege specific "affirmative acts on the part of [FCA] in hiding, concealing or covering up the matters complained of." Herron, 924 F. Supp. 2d at 1176. Neither "mere nondisclosure" nor "generalized allegations with respect to active concealment" will suffice. Id.; see also Punian, 2016 WL 1029607, at *16 ("[C]ourts

---

F.3d at 1142; see also Becerra, 2017 WL 951028, at *8 ("A duty to disclose a material fact may arise out of factual allegations of 'any safety concerns posed by the defect.'" (quoting Daugherty, 51 Cal. Rptr. 3d at 127)); Lassen, 211 F. Supp. 3d at 1286-1287 ("Insofar as consumer fraud law requires sellers to disclose defects that raise safety concerns, that is because safety-related defects are considered sufficiently material to trigger a duty to disclose in order to avoid deceiving a consumer, not because consumer fraud law is directly concerned with consumer safety." (emphasis in original)); In re MyFord Touch, 46 F. Supp. 3d at 958 (defendant has a duty to disclose "when there is a known defect in a consumer product and there are safety concerns associated with the product's use"); In re Toyota (Unintended Acceleration), 754 F. Supp. 2d at 1191 n.25 ("The risk of injury and/or death associated with the alleged . . . defect is the type of 'unreasonable risk' that leads to a duty to disclose under California law." (quoting Daugherty, 51 Cal. Rptr. 3d at 127)); Ehrlich v. BMW of N. Am., LLC, 801 F. Supp. 2d 908, 918 (C.D. Cal. 2010) ("[T]he Court concludes that a safety-based exception exists that might create a duty to disclose a defect even after the period for an express warranty expires and Plaintiff has sufficiently alleged . . . an unreasonable safety risk that would be material to a reasonable consumer."). However, for FCA to have a duty to disclose under this theory, it must still have knowledge of the defect. For the reasons noted above, Beck has failed to sufficiently allege that FCA had any knowledge of the defective rotary shifter system at the time of sale.

require more than facts showing that the defendant knew of the alleged defect and did nothing to fix it or alert customers to its existence."); <u>Taragan</u>, 2013 WL 3157918, at *7 ("An allegation of active concealment must plead more than an omission; rather, a plaintiff must assert affirmative acts of concealment; e.g., that the defendant sought to suppress information in the public domain or obscure the consumers' ability to discover it.").

FCA argues that Beck did not adequately plead facts that FCA took any affirmative acts of concealment to give rise to a duty to disclose. Def. Mot. at 13-14 (citing <u>Taragan</u>, 2013 WL 3157918, at *7). FCA claims that Beck has only proffered allegations of omission, which is insufficient. <u>Id.</u> at 13. Aside from a general claim that "FCA had a duty to disclose because it . . . concealed safety risks," Pl. Resp. at 11, Beck provides no further argument or analysis on this point, and he appears to have abandoned this duty-to-disclose avenue.

Upon its own review, the Court finds that the complaint is replete with conclusory allegations of active concealment. <u>See, e.g.</u>, Compl. ¶ 13 ("FCA was aware of the defect in the Defective Shifter System and fraudulently concealed the defect from Plaintiff and members of the Classes."); <u>id.</u> ¶ 49 ("FCA fraudulently, intentionally, negligently and/or recklessly omitted and concealed from Plaintiff and members of the Classes the defect in the Class Vehicles even though FCA knew of should have known of design and manufacturing defects in Class Vehicles and that vehicles' design violated basic guidelines."); <u>id.</u> ¶ 74 ("FCA actively concealed the true standard, quality, character, nature and grade of the Class Vehicles and knowingly made misrepresentations and omissions about the quality, reliability, safety, characteristics and performance of the Class Vehicles."); <u>id.</u> ¶ 137 ("FCA concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of the Class Vehicles."). However, there are no facts alleged that FCA took any specific affirmative acts to conceal the

alleged defective rotary shifter system.  Therefore, the Court concludes that Beck has failed to sufficiently plead that FCA actively concealed a defect in the rotary shifter system to give rise to a duty to disclose.

### iii.  Partial Representations

A duty to disclose based on a partial representation may arise when "the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead."  Herron, 924 F. Supp. 2d at 1177.  A plaintiff must "plead reliance on at least some misleading partial representations."  Opperman v. Path, Inc., 84 F. Supp. 3d 962, 984 (N.D. Cal. 2015) (citing In re Toyota Motor Corp., 785 F. Supp. 2d 883, 924 (C.D. Cal. 2011)).

FCA argues that Beck did not plead a duty to disclose based on partial representations because he did not: (i) "describe with specificity any representations made by FCA US to him"; (ii) "plead how he relied on such partial disclosures"; or (iii) plead "the manner in which such representations or omissions were false or misleading."  Def. Mot. at 13 (emphasis omitted).  In response, Beck contends that FCA "made repeated statements about the safety of its vehicles — none of which included identification of the rollaway hazards created by the Defective Shifter System."  Pl. Resp. at 12.

Beck's allegations regarding partial representations are insufficient to trigger a duty to disclose.  Aside from a conclusory allegation that he purchased his particular vehicle "because of its reputation for safety and utility consistent with his review of FCA's advertising messaging regarding safety and reliability," Compl. ¶ 18, Beck never alleges that he or the class members ever saw, heard, or relied on any of the supposedly partial representations on FCA's website. Nor does he allege that he was somehow misled by those partial representations in such a way

that FCA should have fully disclosed the related information.  As such, Beck has failed to adequately plead a duty to disclose based on partial representations.  See Opperman, 84 F. Supp. 3d at 984-985 ("Because Plaintiffs have failed to plead that they saw, heard, or relied on such [specific] misrepresentations, Plaintiffs' partial-representation theory fails.").

Beck's failure to allege facts that FCA had a duty to disclose requires dismissal of his omission claim under the UCL.  This portion of FCA's motion is granted.  Because the elements for a duty to disclose based on active concealment are also required to state claim for fraudulent concealment under California law, see Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1163 (9th Cir. 2012), Beck's claim for fraudulent concealment is dismissed in its entirety.

### D.  California Warranty Claims

#### 1.  Pre-Suit Notice

Under California law, a plaintiff is required to provide a defendant with pre-suit notice within a reasonable time after discovering the alleged breach of warranty.  Cal. Com. Code § 2607(3)(A) ("The buyer must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy."); Alvarez v. Chevron Corp., 656 F.3d 925, 932 (9th Cir. 2011) ("To avoid dismissal of a breach of contract or breach of warranty claim in California, a buyer must plead that notice of the alleged breach was provided to the seller within a reasonable time after discovery of the breach.").  Notice that follows, or is contemporaneous with, the filing of the lawsuit is insufficient.  Alvarez, 656 F.3d at 932 (sending notice letter to the defendant simultaneously with the complaint fails to satisfy California's pre-suit notice requirement).

FCA argues that Beck failed to provide pre-suit notice of his warranty claims before filing suit.  See Def. Mot. at 17-18, 20.  In response, Beck claims that a consumer is not required

to provide such notice where the "claims are against a defendant in its capacity as a manufacturer." Pl. Resp. at 24 (citing <u>Rosales v. FitFlop USA, LLC</u>, 882 F. Supp. 2d 1168, 1178 (S.D. Cal. 2012); <u>Aaronson v. Vital Pharm., Inc.</u>, No. 09-CV-1333, 2010 WL 625337, at *5 (S.D. Cal. Feb. 17, 2010)). The Court agrees with Beck.

For cases involving consumers, "plaintiffs are not required to provide pre-suit notice to a remote seller/manufacturer with whom they have not dealt." <u>In re Carrier IQ, Inc.</u>, 78 F. Supp. 3d 1051, 1103 (N.D. Cal. 2015); <u>see also</u> <u>Minkler v. Apple, Inc.</u>, 65 F. Supp. 3d 810, 817 (N.D. Cal. 2014) (although there in an exception to the notice requirement where the action in brought injured consumer against manufactures with whom they have not dealt, the exception does not apply because the plaintiff pled that she had direct dealings with Apple); <u>Greenman v. Yuba Power Prods., Inc.</u>, 377 P.2d 897, 900 (Cal. 1963) (concluding that the "notice requirement . . . is not an appropriate one for the court to adopt in actions by injured consumers against manufacturers with whom they have not dealt"); <u>but see</u> <u>Lengen v. Gen. Mills, Inc.</u>, 185 F. Supp. 3d 1213, 1223 (E.D. Cal. 2016) (dismissing express warranty claim where consumer did not provide manufacturer with pre-suit notice). Because there are no allegations that Beck has dealt with FCA directly, pre-suit notice of Beck's warranty claims was not required.

## 2. Express Warranty Claims

Beck asserts two express warranty claims under California law — one pursuant to California Commercial Code § 2313, and one pursuant to the Song-Beverly Act. Beck alleges that FCA provided two express written warranties — a Basic Limited Warranty and a Powertrain Limited Warranty. Compl. ¶¶ 161, 171; <u>see also</u> <u>id.</u> ¶ 172 ("Under warranties provided to members of the Classes, FCA promised to repair or replace covered defective components, including the Defective Shifter System, at no cost to owners and lessees of the Class Vehicles.").

Beck claims that FCA breached these express warranties by "failing to remedy the defect in the Defective Shifter System free of charge within a reasonable time." Id. ¶ 162; see also id. ¶ 173 ("FCA failed to inform Plaintiff and members of the Classes of the existence of the Defective Shifter System and associated safety hazard, and failed to provide suitable repair or replacement of the Defective Shifter System free of charge within a reasonable time.").

FCA argues that Beck has failed to sufficiently allege that FCA breached any express warranty because he does not allege that he either presented his vehicle for any repair during the warranty period, or that FCA ever declined to perform any free repair. See Def. Mot. at 19-20; see also Def. Reply at 6-7 ("[T]he only way the warranty could be breached is by refusal to repair, and logically, there could be no refusal unless Plaintiff presents his vehicle and asks for a repair.").

Beck does not refute FCA's contention that he did not present his vehicle for repair. Rather, Beck argues that the express warranties do not "require[ ] that the vehicle be physically presented to dealerships for repair." Pl. Resp. at 17. Beck then states that "[t]here is simply no requirement that a vehicle owner must present the vehicle to a dealership before proceeding with an [express] warranty claim against a manufacturer. Id. (citing Keegan v. Am. Honda Motor Co., Inc., 838 F. Supp. 2d 929, 951 (C.D. Cal. 2012)).[11] The Court finds that Beck is incorrect in both fact and law.

In this case, Section 2 of the 2015 Ram 1500 Warranty booklet, entitled "What's Covered Under Chrysler Group LLC's Warranties," includes a description of the Basic Limited Warranty

_____

[11] It appears that Beck likely cited Keegan in error. That decision did not address the issue of whether a plaintiff can maintain an express warranty claim under either § 2313 or the Song-Beverly Act when he or she never sought a repair for the vehicle. And the portion of the decision that Beck cites to deals with the pre-suit notice requirement by a consumer to a manufacturer.

for Beck's vehicle, which "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." 2015 Ram 1500 Warranty at 5. That section similarly describes the Powertrain Limited Warranty, which "covers the cost of all parts and labor needed to repair a powertrain component listed in section 2.4E below that is defective in workmanship and materials." Id. at 10. In sum, both of these express warranties promise that FCA will cover the costs for both parts and labor for certain repairs during the warranties' duration.

Section 6 of the 2015 Ram 1500 Warranty booklet, entitled "How to Get Warranty Service," then provides the owner with information on how and where to take their vehicle for warranty servicing. See generally 2015 Ram 1500 Warranty at 23-28. In particular, section 6.1 the booklet, entitled "Where to Take Your Vehicle," clearly states that, for vehicles in the United States:

> Warranty service must be done by an authorized Chrysler, Dodge, Jeep or Ram dealer. We strongly recommend that you take your vehicle to your Selling Dealer. They know you and your vehicle best, and are most concerned that you get prompt and high quality service. If you move within the United States, warranty service may be requested from any authorized Chrysler, Dodge, Jeep or Ram dealer.

2015 Ram 1500 Warranty, Section 6, at 23 (emphasis added).[12]

Thus, to the extent Beck contends that the warranty itself does not require that he take his vehicle to an authorized dealership to receive warranty service, he is incorrect.

To prevail on a breach of an express warranty claim under § 2313, the plaintiff must prove that the seller: "(1) made an affirmation of fact or promise or provided a description of its

---

[12] This language is similar to the warranty language in In re Toyota (Unintended Acceleration), 754 F. Supp. 2d at 1178 ("To obtain warranty service in the United States, . . . take your vehicle to an authorized Toyota dealership.").

good; (2) the promise or description formed part of the basis of the bargain; (3) the express warranty was breached; and (4) the breach caused injury to the plaintiff." <u>Keegan</u>, 838 F. Supp. 2d at 949; <u>Mui Ho v. Toyota Motor Corp.</u>, 931 F. Supp. 2d 987, 993 (N.D. Cal. 2013) (same). For an express warranty claim under the Song-Beverly Act, the plaintiff must prove the following elements: "(1) the product had a defect or nonconformity covered by the express warranty; (2) the product was presented to an authorized representative of the manufacturer for repair; and (3) the manufacturer or its representative did not repair the defect or nonconformity after a reasonable number of repair attempts." <u>Gonzalez v. Drew Indus., Inc.</u>, 750 F. Supp. 2d 1061, 1073 (C.D. Cal. 2007).

Importantly, to pursue an express warranty claim, the plaintiff must present his or her vehicle for repair. <u>See</u> <u>In re Toyota (Unintended Acceleration)</u>, 754 F. Supp. 2d at 1179 ("Plaintiffs who neither sought repairs pursuant to the recalls nor sought repairs for [sudden-unintended-acceleration]-related issues may not pursue a claim for breach of express warranty based on the written warranty."); <u>see also</u> <u>In re MyFord Touch</u>, 46 F. Supp. 3d at 970-971 (dismissing express warranty claims of four plaintiffs who did not bring their cars in for repairs).[13]  This is particularly true for an express warranty claim under the Song-Beverly Act, as the second element specifically requires that the product be presented to an authorized representative of the manufacturer for repair. <u>Gonzalez</u>, 750 F. Supp. 2d at 1073.

There are no allegations that Beck ever brought his vehicle to an authorized dealer for warranty service, which explains why there no allegations that FCA breached its express warranties to cover the costs for parts and labor regarding certain types of repairs.  As such, Beck

_____

[13] Even if Beck were to claim that bringing his vehicle into the dealership for service would have been futile, courts have recognized the lack of any case law for such an exception to the presentation required by the terms of an express warranty. <u>E.g.</u> <u>In re MyFord Touch</u>, 46 F. Supp. 3d at 971.

has failed to sufficiently plead that FCA breached either of the express warranties for his 2015 Ram 1500.

This portion of FCA's motion is granted, and Beck's express warranty claims are dismissed.

### 3. Implied Warranty Claims

Beck asserts two implied warranty claims under California law — one pursuant to California Commercial Code § 2314, and one pursuant to the Song-Beverly Act. Beck alleges that the class vehicles were not "in merchantable condition" because they were not "fit for the ordinary purpose of providing safe and reliable transportation." Compl. ¶¶ 151, 175. FCA raises several arguments for why these two claims should be dismissed.

FCA first argues that Beck's UCC-based implied warranty claim must be dismissed because Beck purchased his vehicle from a third party and, therefore, lacks vertical privity with FCA under California law. Def. Mot. at 16. In response, Beck recognizes that he did not purchase his vehicle directly from the manufacturer, but he claims that there is a third-party beneficiary exception to the privity requirement. Pl. Resp. at 14. This exception, says Beck, allows a plaintiff who purchased a vehicle from a third party to pursue implied warranty claims against the automobile manufacturer. Id. The Court agrees with Beck.

A plaintiff asserting a breach of implied warranty under California Commercial Code § 2314 must stand in vertical privity with the defendant. Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1024 (9th Cir. 2008) ("A lack of vertical privity requires the dismissal of [the plaintiff's] implied warranty claims."). There are some recognized exceptions to the privity requirement, including when a plaintiff relies on written labels or advertisements of a manufacturer. Id. at 1023. Although federal courts in California have reached differing

conclusions on whether a consumer can assert an implied warranty claim as a third-party beneficiary between the manufacturer and the retailer, the clear weight of authority has found that such an exception is cognizable. See, e.g., In re MyFord Touch, 46 F. Supp. 3d at 984 (rejecting the defendant's argument that the third-party beneficiary exception is not cognizable under California law); In re Toyota (Unintended Acceleration), 754 F. Supp. 2d at 1184 (same); Michael v. Honest Co., Inc., No. LA CV 15-07059, 2016 WL 8902574, at *27 (C.D. Cal. Dec. 6, 2016) (same); Bryde, 2016 WL 6804584, at *16 (same); Barakezyan v. BMW of N.A., LLC, No. CV 16-00173, 2016 WL 2840803, at *8 (C.D. Cal. Apr. 7, 2016) (same); but see In re Seagate, 2017 WL 528398, at *8 (recognizing that a majority of courts have held that the third-party beneficiary exception may be invoked, but holding that the Ninth Circuit's decision in Clemens requires dismissal of the claim); Gonzalez v. Mazda Motor Corp., No. 16-cv-02087, 2017 WL 345878, at *3 (N.D. Cal. Jan. 5, 2017) (declining to extend the list of exceptions to the privity requirement to encompass third-party beneficiaries).

Here, Beck has sufficiently alleged that, when he "purchased a new 2015 Ram 1500 from a dealership in Carlsbad, California," Compl. ¶ 18, it was "through FCA's authorized agents," and that he was "expected to be the eventual purchaser[ ] of the [vehicle] when bought from [the dealership]," id. ¶ 150. Thus, at this stage of the proceedings, Beck has sufficiently pleaded that he was a third-party beneficiary. See In re Toyota (Unintended Acceleration), 754 F. Supp. 2d at 1185 (holding that plaintiffs' breach of implied warranty claim was not precluded by the lack of vertical privity where plaintiffs "pled that they purchased vehicles from a network of dealers who [we]re agents of [Toyota]" and that plaintiffs "were the intended consumers").

Next, FCA argues that both these claims should be dismissed because Beck does not allege that the implied warranty was still in effect when Beck encountered a vehicle problem.

Def. Mot. at 16. According to FCA, "[l]imiting the implied warranty to [an express warranty] duration is valid and enforceable in California." Id. (citing In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig., 758 F. Supp. 2d 1077, 1100 (S.D. Cal. 2010)). FCA then claims that its express written warranties lasted for the shorter of three years or 36,000 miles. Id. (citing 2015 Ram 1500 Warranty, Ex. A to Def. Mot., at 4 (Dkt. 24-2)).[14] However, FCA contends that Beck did not allege in the complaint that his vehicle had less than 36,000 miles on it when it allegedly rolled away after he put it in Park. Id. at 17.

In response, Beck first claims that there are two express warranties at play — a Basic Limited Warranty (for a period of three years or 36,000 miles, whichever occurs first) and a Powertrain Limited Warranty (for a period of five years or 100,000 miles, whichever occurs first). Pl. Resp. at 14 (citing Compl. ¶ 171). Beck then states that he purchased his vehicle on June 22, 2015, which was less than two years before filing his complaint, and that he had "specifically allege[d] that he experienced the defect in the Defective Shifter System within the warranty periods." Id. (citing Compl. ¶¶ 18-19, 173). The Court sides with Beck, but for a different reason.

Under California law, "every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable." Cal. Civ. Code § 1792. "Merchantable" goods, in turn, are defined to be "fit for the ordinary purposes for which such goods are used . . . ." Cal. Com. Code

---

[14] FCA contends that its reliance on the 2015 Ram 1500 Warranty is proper for its motion to dismiss under Bassett v. National Collegiate Athletic Association, 528 F.3d 426, 430 (6th Cir. 2008), because the Beck pleads express warranty claims based on the written warranty issued by FCA, and the warranty is central to Beck's claims. Beck does not challenge this assertion. The Court agrees with FCA.

§ 2314(2)(c).  A breach of this implied warranty "occurs if the product lacks even the most basic degree of fitness for ordinary use."  Becerra, 2017 WL 951028, at *12.

"The duration of the implied warranty of merchantability and where present the implied warranty of fitness shall be coextensive in duration with an express warranty which accompanies the consumer goods, provided the duration of the express warranty is reasonable."  Cal. Civ. Code § 1791.1(c).  However, "in no event shall such implied warranty have a duration of less than 60 days nor more than one year following the sale of new consumer goods to a retail buyer."  Id.; see also Tietsworth v. Sears, 720 F. Supp. 2d 1123, 1142 (N.D. Cal. 2010) ("The duration of an implied warranty of merchantability is one year if the express warranty is one year or more.").

This one-year durational limitation for implied warranty claims caused some confusion among the California federal district courts when it came to the discovery of latent defects.  The Ninth Circuit weighed in on this issue a few years ago and concluded that § 1791.1 "does not create a deadline for discovering latent defects or for giving notice to the seller."  Daniel v. Ford Motor Co., 806 F.3d 1217, 1223 (9th Cir. 2015) (emphasis added); see also Glenn v. Hyundai Motor Am., No. SACV 15-2052, 2016 WL 7507766, at *4 (C.D. Cal. Nov. 21, 2016) ("Under Daniel and Mexia[ v. Rinker Boat Co., Inc., 95 Cal. Rptr. 3d 285, 295 (Cal. Ct. App. 2009)], it is enough that [the plaintiff] alleges a latent defect that renders the good unmerchantable — she need not discover the latent defect within the one year period."); Salas v. Toyota Motor Sales, U.S.A., Inc., No. CV 15-8629, 2016 WL 7486600, at *12 (C.D. Cal. Sept. 27, 2016) (same);

Viewing the allegations in the complaint in the light most favorable to Beck, the inherent defect in the rotary shifter system is latent and existed at the time of sale.  See Compl. ¶¶ 151, 175.  This is sufficient to withstand FCA's motion to dismiss.  See Ehrlich, 801 F. Supp. 2d at

924 (following holding in <u>Mexia</u> that "so long as a latent defect existed within the one-year period, its subsequent discovery beyond that time did not defeat an implied warranty claim."); <u>see also</u> <u>Philips v. Ford Motor Co.</u>, No. 14-CV-02989, 2016 WL 1745948, at *9 (N.D. Cal. May 3, 2016) ("It is possible that, at trial, California Plaintiffs will be unable to produce sufficient evidence to demonstrate that the [electronic power assisted steering] systems were inherently defective.  However, for purposes of the instant motion to dismiss, the Court . . . accept[s] as true California Plaintiffs' allegations that the Vehicles suffered from a systemic and latent design defect.").[15]

FCA then argues that Beck has not alleged that "his own vehicle ever experienced a single instance where it showed it was in the Park gear and it was not," such that the vehicle is unfit for the purpose of transportation.  Def. Mot. at 17.  According to FCA, "[a]ll that [Beck] alleges is that an unsafe condition could/might result if he fails to engage the Park gear upon exit."  <u>Id.</u>  The Court disagrees.

Under California law, the implied warranty of merchantability "requires only that a vehicle be reasonably suited for ordinary use."  <u>Resnick v. Hyundai Motor Am., Inc.</u>, ___ F. Supp. 3d ___, 2017 WL 1531192, at *12 (C.D. Cal. Apr. 13, 2017).  "Since cars are designed to provide transportation, the implied warranty of merchantability is simply a guarantee that they will operate in a safe condition and substantially free of defects.  Thus, where a car can provide safe, reliable transportation, it is generally considered merchantable."  <u>Keegan</u>, 838 F. Supp. 2d at 945; <u>see also</u> <u>Resnick</u>, 2017 WL 1531192, at *12 ("[M]erely because a vehicle provides transportation from point A to point B" does not mean that the warranty is not violated.).

---

[15] As the 2015 Ram 1500 warranty correctly recognizes, "[s]ome states do not allow limitations on how long an implied warranty lasts, so the above limitations may not apply to you."  2015 Ram 1500 Warranty at 4.

Beck has alleged that the class vehicles all have a defective rotary shifter system that may wrongly indicate that the vehicles are in Park when they are not. Compl. ¶¶ 3, 5. Although the vehicles may seemingly transport the putative class members around town without problem, the ordinary purpose of a vehicle also includes that, when the vehicle is placed into the Park gear, it is actually parked. There is also the expectation that the vehicles will remain in the same location where they were parked, absent any external intervention. A vehicle with a defect that results in it not being in Park, despite an indication to the contrary, is hardly in a safe condition to operate. This is particularly true if the owner is unfortunate enough to leave the car "parked" on an incline.

Nevertheless, "it is not enough to allege that a product line contains a defect or that a product is at risk of manifesting this defect." Taragan, 2013 WL 3157918, at *4 (quoting O'Neil v. Simplicity, Inc., 574 F.3d 501, 503 (8th Cir. 2009)). To maintain an implied warranty claim under California law, the "plaintiffs must allege that their product actually exhibited the alleged defect." Id. (emphasis omitted).

Although FCA contends that Beck never experienced any problem with his vehicle regarding the purported defect, this is simply not true. Beck clearly alleges that his vehicle exhibited the purported defect. See Compl. ¶ 19 ("Given the Defective Shifter System, Plaintiff experienced a rollaway incident in his Ram 1500. During this incident, Plaintiff pulled into his driveway and put the vehicle in 'Park.' The vehicle started rolling backwards down the driveway before Plaintiff could turn off the engine."); see also id. ¶ 173 ("Plaintiff and members of the Classes experienced the defect in the Defective Shifter System within the warranty periods . . . .").

Finally, during the hearing on the motion, FCA argued that the implied warranty claims should be dismissed because Beck is still driving his vehicle. See also Def. Mot. at 2 ("[Beck] does not allege that he stopped driving his vehicle."); id. at 4 n.2 (the fact that Beck "does not allege that he has stopped driving his vehicle" "defies the overall premise of his case, i.e., that the rotary shifter represents a clear and present danger"). Beck's counsel did not refute the contention that Beck is still driving his vehicle in either the briefing or at oral argument.

In the complaint, Beck alleges that he still owns his vehicle. See Compl. ¶ 18. But, as FCA correctly points out, there is no indication in the complaint that, despite the safety concerns, he has actually stopped driving his vehicle. The lack of such an allegation warrants dismissal of his implied warranty claims. See, e.g., Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc., 992 F. Supp. 2d 962, 980 (C.D. Cal. 2014) (dismissing implied warranty claim because "Plaintiffs have not alleged that they stopped using their vehicles"); Kent v. Hewlett-Packard Co., No. 09-5341, 2010 WL 2681767, at *4 (N.D. Cal. July 6, 2010) (dismissing implied warranty claim because "[p]laintiffs do not allege that they have been forced to abandon the use of their computers"); cf. In re Toyota Corp., 790 F. Supp. 2d 1152, 1165 (C.D. Cal. 2011) ("After all, if Plaintiffs do not allege that they experienced a safety defect, do not allege that they tried to sell or trade in the vehicle at a loss, and do not allege that they have stopped using the vehicle owing to the safety defect, how plausible are allegations of 'overpayment, loss in value, or loss of usefulness'?").

This portion of FCA's motion is granted, and Beck's implied warranty claims are dismissed.

### E. Magnuson-Moss Warranty Act Claim

In count one of the complaint, Beck brings a claim under the MMWA. See Compl. ¶¶ 86-102. Because the MMWA provides a federal cause of action for state law warranty

38

claims, <u>Birdsong</u>, 590 F.3d at 958 n.2 (substantive elements under the MMWA are the same as under state warranty law), a plaintiff's MMWA claim will ultimately "stand or fall with his express and implied warranty claims," <u>Clemens</u>, 534 F.3d at 1022; <u>see also</u> <u>id.</u> ("disposition of the state law warranty claims determines the disposition of the [MMWA] claims"). Beck failed to adequately allege his state warranty claims. Thus, his MMWA claim fails, too. <u>Id.</u>; <u>Birdsong</u>, 955 F.3d at 958 n.2 (concluding that plaintiffs' MMWA claim was properly dismissed because plaintiffs failed to state a claim for breach of an express or implied warranty under California law).

This portion of FCA's motion is granted, and Beck's MMWA claim is dismissed.

## IV. CONCLUSION

For the reasons stated above, the Court grants FCA's motion to dismiss (Dkt. 24), and dismisses the complaint with prejudice.[16]

SO ORDERED.

Dated: August 11, 2017                s/Mark A. Goldsmith
      Detroit, Michigan                     MARK A. GOLDSMITH
                                       United States District Judge

---

[16] The default rule in the Sixth Circuit is that, "if a party does not file a motion to amend or a proposed amended complaint in the district court, it is not an abuse of discretion for the district court to dismiss the claims with prejudice." <u>Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC</u>, 700 F.3d 829, 844 (6th Cir. 2012) (quoting <u>CNH Am. LLC v. UAW</u>, 645 F.3d 785, 795 (6th Cir. 2011)). The Court previously afforded Beck the opportunity to amend his complaint to cure any pleading defects identified in FCA's motion to dismiss, <u>see</u> 3/24/2017 Order (Dkt. 25), but Beck chose not to take advantage of that opportunity. Beck also has not filed either a motion to amend the complaint or a proposed amended complaint. Nor did Beck request that the Court not dismiss his complaint with prejudice in his response brief. Accordingly, Beck's complaint is dismissed with prejudice. <u>See</u> <u>Starkey v. JPMorgan Chase Bank, NA</u>, 573 F. App'x 444, 450 (6th Cir. 2014).

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 11, 2017.

s/Karri Sandusky
Case Manager